UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,                                    Case No. 16-cr-20135

v.                                            UNITED STATES DISTRICT COURT JUDGE
                                              GERSHWIN A. DRAIN

MICHAEL TAYLOR GARDNER,
                                              UNITED STATES MAGISTRATE JUDGE
Defendant.                                    DAVID R. GRAND

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE SEIZED FROM DEFENDANT'S PHONE [29]**

**I. INTRODUCTION**

On March 3, 2016, a grand jury indicted Michael Taylor Gardner ("Defendant") on one count of Sex Trafficking of Children, in violation of 18 U.S.C. § 1591(a)(1). Dkt. No. 14, pp. 1–2 (Pg. ID No. 30–31). The Government filed a First Superseding Indictment on May 31, 2016, adding a second count for production of child pornography, in violation of 18 U.S.C. § 2251(a). *See* Dkt. No. 32, pp. 2–3 (Pg. ID No. 245–46).

On May 26, Defendant filed a Motion For Evidentiary Hearing to Test Whether Evidence was Illegally Seized from Defendant's Phone without Warrant. Dkt. No. 29. The Court subsequently held an evidentiary hearing that continued over three days in July, August, and September 2016. At the hearing, testimony

-1-

was heard from three witnesses—Detective Brian Shock, Sergeant Larissa LaMay, and Minor Victim One ("MV-1")—to determine whether Defendant's cell phone was illegally seized without a warrant, based on third-party consent. *See id*. at 1 (Pg. ID No. 148). For all of the reasons stated below, Defendant's motion to suppress evidence gathered from the October 2015 search of his cell phone is DENIED.

## II. BACKGROUND

### A. The Sting Operation

On October 10, 2015, a Task Force officer, Justin Forrest, was working undercover as part of Southeastern Michigan Crimes Against Children (SEMCAC), monitoring a website, www.backpage.com ("Backpage"). Forrest located an advertisement from a person describing herself as "Jewel – 18." The photographs in the advertisement allegedly depicted MV-1. The number listed in the advertisement was XXX-XXX-3399.

Forrest called the above number and spoke with a female at least three times, finally arranging to meet at the Red Roof Inn in Warren. Officers conducting surveillance saw a Ford Explorer arrive at the Red Roof Inn. MV-1 got out of the car, while the Defendant and others remained in the car. MV-1 called Forrest to notify him that she had arrived at the Red Roof, where they met in the lobby and went up to the room. MV-1 was carrying a cell phone, which she says she needed

for security reasons, but did not have identification on her. After Forrest and MV-1 exchanged money and agreed on the terms of a sex date, other officers entered the room.

MV-1 was taken into custody and provided with Miranda warnings. Detective Shock, who was on the arrest team, described her as young, clean, and well-spoken, although he notes she was a bit evasive initially. Although she initially stated she was over eighteen, MV-1 was later identified as a seventeen-year-old juvenile. She was in possession of one cell phone, the phone at issue in this motion—an iPhone 5.

## B. MV-1's Consent to Search Defendant's Phone

Detective Shock provided MV-1 with the consent form to search the phone and filled it out with her at the hotel room. The consent form bears Detective Shock's name as the requesting officer and he remembered being the officer to obtain MV-1's consent to search the phone. Detective Shock was only present during the initial part of MV-1's custody, and did not transport her to the police department or take part in her interviews there. Accordingly, the record comports with Detective Shock and Sergeant LaMay's recollection that the consent form was filled out at the hotel room, rather than MV-1's uncertain belief that she filled it out at the Southfield Police Department.

Shock advised MV-1 that she could refuse to consent to the search. However, she was also advised that law enforcement would seek a warrant if she refused to consent to the search, which could delay the return of the phone. If she consented to the search, she was told that the phone would be returned to her that night. MV-1 testified during the evidentiary hearing that she consented to the search because she wanted to get the phone back that night. She feared that if law enforcement kept the phone longer Defendant would "put his hands on [her]." Based on MV-1's testimony about her abusive relationship with Defendant, this statement appears to imply MV-1 feared Defendant would physically harm her. Defendant was not present during or aware of MV-1's consent to search the phone.

Initially, MV-1 provided the officers with a false last name ("Bingham") because she was scared that she would get in trouble. The first and middle names that MV-1 provided were truthful and accurate. MV-1 did not have her state identification card on her, which she believes officers later recovered from the vehicle containing Defendant and three other men. The false last name appears on the consent to search form, SEMCAC case worksheet, and an advice of rights form filled out by Detective Kane at the Southfield Police Department. MV-1 testified that the officers determined she was being untruthful about her last name before she was transported to the Southfield Police Department, but also stated that she would not have continued to provide a false last name to officers if they had

-4-

ascertained her actual last name. Sergeant LaMay recalls first learning of MV-1's actual last name from the command post late on October 10th or October 11th, rather than at the hotel. Detective Shock was not aware that MV-1 had provided a false last name.

MV-1 believes that she told the officers that the phone belonged to her boyfriend and that he was outside. Neither of the two testifying officers recalls hearing her state that the phone was not hers, or that the phone belonged to a boyfriend nearby, while she was in custody. Detective Shock recalled that MV-1 said "she was there with somebody," and that "their name was Mike and that he dropped her off." In the hearing, MV-1 addressed Defendant by his nickname, "Sosa," and mentioned that Defendant's cousin, Mike, was the person who drove the vehicle to the hotel that evening. Shock did not recall MV-1 saying where "Mike" went. Both Detective Shock and Sergeant LaMay stated that, had she informed them that the phone was not hers, they would have taken efforts to identify the owner, obtain a search warrant, and would not have had MV-1 fill out the consent form.

The contents of the cell phone were downloaded while MV-1 was processed and interviewed at the Southfield police station. At the end of the night, MV-1 was released, and the cell phone was returned to her.

### C. Detention of Defendant and Other Vehicle Passengers

Meanwhile, during the time the officers were in the hotel room with MV-1, other officers approached the Ford Explorer that MV-1 arrived in, and detained the vehicle's occupants, including Defendant. Defendant and the other three occupants were interviewed. Each of the men in the car had a cell phone, except Defendant, who Sergeant LaMay testified told the officers that he had a black cell phone in the back seat. Sergeant LaMay stated that all three of the men with cell phones claimed ownership of their respective phones and gave consent to search the phones. The officers never recovered a phone in the back seat of the vehicle that Defendant said belonged to him.

### D. Search of Defendant's Cell Phone

Search of the cell phone revealed that for a period of several weeks leading up to October 10, 2015, Defendant and MV-1 were both using the phone, although the Defendant still seemed to be the owner and primary user of the phone during this period. Prior to this period, it appears that Defendant used the cell phone almost exclusively. The search also revealed naked photographs of MV-1; a phone text conversation, between MV-1 and Gardner, discussing, MV-1's age; proof that the cell phone user had contacted Backpage and motels in the vicinity of the arrest; and a number of text messages from the days leading up to October 10 that were exchanged with commercial sex customers, discussing rates and specific acts.

When Defendant was arrested on February 19, 2016, the cell phone in question was again seized by law enforcement. Law enforcement obtained a search warrant for the phone based on information from the October 10 search of the phone, publicly available Facebook images, and Defendant's October 2015 interview. The government expects to use evidence obtained from this search of the cell phone and social media accounts ("February 25 search") at trial.

Defendant now challenges the admissibility of the fruits of the cell phone search and the use of that information in obtaining the February 25 search warrant.

### III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," such that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

A defendant seeking to suppress evidence based upon a Fourth Amendment challenge must show that he or she had a "legitimate expectation of privacy" in the place or objects searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). This requirement is twofold, in that the defendant must have exhibited an actual subjective expectation of privacy, and that expectation must be one that society

recognizes as reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

If the defendant successfully shows that he or she had a reasonable expectation of privacy in the place or object searched, the burden shifts to the government. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("[T]he burden is on those seeking the exemption to show the need for it."). The government must then establish that the search was either performed pursuant to a valid warrant, or that the warrantless search fell within one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Katz*, 389 U.S. at 357; *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions.").

One of the recognized exceptions to the warrant requirement is a search conducted pursuant to valid third-party consent. *See Fernandez v. California*, 134 S. Ct. 1126, 1137 (2014); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). This consent must be freely and voluntarily given by an individual who has common authority, or appears to have authority, to consent to the search. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006); *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008) ("So long as the consenting individual has actual common authority over the room . . . or apparent common authority over the room, . . .

-8-

officers may rely on the consent of one of the occupants in this setting."). The government bears the burden of proving that the consent was freely and voluntarily given. *See Florida v. Royer,* 460 U.S. 491, 497 (1983) ("[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.").

Once given, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). Where consent to search was given by a person with shared authority, a warrantless search is unreasonable as to a defendant who was both physically present and expressly refused to consent before the search took place. *Randolph*, 547 U.S. at 120. Nevertheless, if a defendant with self-interest in objecting is nearby, but is not invited to take part in discussion regarding consent to search, that potential objector "loses out," and the search will be deemed valid. *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (citing *Randolph*, 547 U.S. at 121).

## IV. DISCUSSION

### A. Expectation of Privacy

Modern cell phones implicate privacy concerns far beyond those implicated by a search of a traditional container. *Riley v. California*, 134 S. Ct. 2473, 2488–89

(2014). This is because modern cell phones may be used to access data anywhere, outside of that cell phone's physical storage, at the touch of a button. *See id.* at 2491. Thus, the Supreme Court has noted that modern cell phones, "[w]ith all they contain and all they may reveal, . . . hold for many Americans 'the privacies of life.' " *Id.* at 2494–95 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). It follows that Defendant's expectation of privacy in his cell phone is one that society recognizes to be reasonable.

However, Defendant also needs to establish that he held an actual, subjective expectation of privacy in his cell phone. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring). In a similar context, regarding the search of computers, courts have found a defendant manifests a subjective expectation of privacy by protecting his or her files with a password. *See United States v. Stabile*, 633 F.3d 219, 232–33 (3d Cir. 2011) ("The failure to use password protection indicates that Stabile relinquished his privacy in the contents of the computer."); *United States v. Andrus*, 483 F.3d 711, 718–19 (10th Cir.), *decision clarified on denial of reh'g*, 499 F.3d 1162 (10th Cir. 2007) (analogizing passwords on computers to physically locked containers); *Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) (finding a subjective expectation of privacy where the defendant kept files password-protected). The Sixth Circuit has also considered the lack of passwords on a computer, in addition to the computer's location and joint access, in determining

-10-

that a defendant's "right to privacy" was not violated. *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (holding that the defendant's wife had apparent authority to consent to search).

Here, there is no dispute that Defendant not only maintained a passcode on his cell phone, but also changed it somewhat regularly. However, he did not keep that passcode entirely to himself, but rather shared the passcode with MV-1 each time he updated it so that she could also use his cell phone. Nevertheless, it appears that Defendant held a subjective expectation of privacy in his cell phone, such that the burden shifts to the Government to establish that the search of Defendant's cell phone fell within an exception to the warrant requirement.

## B. MV-1's Consent to Search Defendant's Cell Phone

### i. Free and Voluntary Third-Party Consent

"The determination of whether consent was valid is a fact-specific inquiry that must be determined by the totality of the circumstances." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Only consent "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion" will suffice. *Id.* (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)). "Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the

individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996), *abrogated on other grounds*, *Muscarello v. United States*, 524 U.S. 125, 138 (1998).

In the present case, the totality of the circumstances weighs in favor of a finding that MV-1's consent was voluntary and freely given, and therefore valid. The Sixth Circuit has previously upheld consent given by minors younger than MV-1, so her age in itself does not weigh against the validity of her consent. *See United States v. Clutter*, 914 F.2d 775, 778 (6th Cir. 1990) (finding children aged 12 and 14, under the circumstances, could consent to search of their mother's bedroom). Further, MV-1's hearing testimony and other evidence demonstrated that she did not lack education, that she was not of low intelligence, and that she understood her constitutional rights. *See United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988).

Law enforcement advised MV-1 that she could refuse consent to search the cell phone, and that they would obtain a search warrant should she refuse. Additionally, they promised that if she consented, they would provide the phone back to her that same night, which they did. These factors do not weigh against the voluntariness of her consent. It is well-settled that a law enforcement officer's

threat to obtain a warrant in the absence of consent does not taint an individual's consent to search, provided the threat to obtain a warrant was not baseless or pretextual. *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998). The evidence provided indicates that the cell phone was used by MV-1 to set up a commercial sex date with the undercover officer, providing sufficient probable cause to justify the issuance of a warrant. Accordingly, it appears that she was both advised of her right to refuse consent, and warned that police could seek a search warrant of the cell phone based on sufficient probable cause.

The Government contends that MV-1 consented to the search of the cell phone while still in the hotel room, although MV-1 now believes that she may have signed the consent form after being transported to the police station.[1] In either case, there is no indication that MV-1 was subject to detention of a length or nature that rendered her consent involuntary. She has not alleged that the police engaged in any coercive or punishing conduct to extract her consent to search the cell phone. When MV-1 was released at the end of the night, the cell phone was returned to her as promised.

Based on the evidence provided, the Court finds the Government met its evidentiary burden to establish that MV-1's consent was given voluntarily.

---

[1] MV-1 testified repeatedly that she did not clearly remember where things happened that evening. The weight of the evidence supports Detective Shock's and Sergeant LaMay's testimony that MV-1 signed the consent form in the hotel room.

### ii.    Actual Authority

A third party with authority or control over the property sought to be searched may grant law enforcement consent to search that property. *Morgan*, 435 F.3d at 663. Actual authority in third-party consent cases "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the [property users] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the [property] to be searched." *Matlock*, 415 U.S. at 171 n.7. Therefore, in order for a third party to possess actual authority to consent to a search, the individual must have either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over the property. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). It is notable that authority does not appear to rest on legal ownership of the property in question.

The Sixth Circuit has noted the following factors tend to establish a lack of actual authority to consent to a search of property: the third-party consenter did not have personal effects within the property to be searched; the defendant exercised exclusive control over the property; and the defendant never gave the consenter permission to look within the property. *United States v. Purcell*, 526 F.3d 953, 962–63 (6th Cir. 2008) (assuming, without deciding, that the third-party did not have actual authority).

-14-

Based on the facts before the Court, it appears that MV-1 did have actual authority to consent to the search of Defendant's cell phone. MV-1's Backpage advertisement was posted using Defendant's phone and listed his phone number as the contact number. The undercover officer called the phone number listed in the advertisement spoke to MV-1 on three separate occasions to arrange the commercial sex date. There is no evidence that Defendant ever picked up the phone when the undercover officer called, which could indicate the phone did not belong to MV-1. Additionally, MV-1 was in possession of only that one phone when she arrived at the Red Roof Inn, and she used Defendant's phone to call the undercover officer to meet her in the lobby. MV-1 also knew the correct passcode to open the cell phone, and voluntarily provided that passcode to law enforcement when giving consent for the search.

MV-1 testified that she told the officers that the phone belonged to her boyfriend. Even if that statement was true, which both of the officers dispute, that does not foreclose that MV-1 had common authority to consent based on mutual use and joint access to the phone. This was not a single isolated instance of MV-1 using Defendant's phone; rather, MV-1 testified that she knew the passcode and used Defendant's phone to talk with individuals responding to her Backpage advertisements "pretty much" every day since her phone had gone missing several

weeks earlier. Defendant has not provided the Court with any cases that demand actual property ownership in order for a third-party joint user to consent to search.

Defendant relies on *United States v. Taylor*, 600 F.3d 678, 682–83 (6th Cir. 2010), in support of his assertion that he was entitled to more privacy because he voluntarily gave the cell phone to MV-1. ("[E]xpectations [of privacy] may well be at their most intense when such effects are deposited temporarily or kept semi-permanently . . . in places under the general control of another.") (quoting *United States v. Waller*, 426 F.3d 838, 848 (6th Cir. 2005); *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978)). However, the cases upon which *Taylor* relies refer to cases where property was stored on the premises of a third party. In *Waller*, the Sixth Circuit found it was unclear as to whether the defendant's suitcase was subject to mutual use by a third-party, and thus officers were not entitled to search suitcase without a warrant without further inquiry. 426 F.3d at 846.

Here, there is no question that the cell phone was not merely being stored on MV-1's person, but rather was given to her for use. The cell phone was used to post the advertisement for the commercial sex date. The cell phone was further used by MV-1 to communicate with the undercover officer and set up their meeting, in addition to her other "dates."

The cell phone was not like a zippered, closed suitcase, stored in a bedroom closet, where there is a lack of clarity about whether the item was subject to mutual

use. *See Waller*, 426 F.3d at 846. Officers assumed that MV-1 had authority to consent to the search of the cell phone because there was actual proof that she had used the phone in arranging the commercial sex date and possessed a clear indication of authority to use the phone: she knew the passcode to open it. *See United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (noting that a computer user can avoid the risk that a joint user would permit others to search files by using a password to exclude others from personal files). Not only did Defendant not exclude MV-1 from access to the phone, he invited her to use the phone and granted her unsupervised possession of the phone during her commercial sex dates, where there was a higher risk of interaction with law enforcement than during lawful activities.

Defendant has argued that officers should have known that MV-1 could not consent to the search, because she initially provided them with a false last name on the forms and lied about being over eighteen. However, the false last name MV-1 provided was a perfectly plausible last name—unlike the "Tinker Bell" or "Santa Claus" examples Defendant argued—and the officers had no means with which to check her name until her identification card was later recovered. The Court does not find that MV-1's use of a false, yet reasonable, last name negated her voluntary consent.

Defendant has further argued that officers should have known that the phone belonged to Defendant, not MV-1, when they determined Defendant was the only occupant of the vehicle to be missing his phone. Had Defendant advised officers he gave his phone to MV-1, or even provided a more innocuous explanation that he loaned his phone to an anonymous "girlfriend" whose phone was missing, a clearer connection could have been established between Defendant and the phone MV-1 had in her possession. The evidence does not support an officer automatically drawing such a conclusion, as the testimony indicates that Defendant claimed his phone was in the back seat of the car, not in the hotel. Even while witnessing officers asking for and receiving consent to search his fellow passengers' phones, Defendant did not provide any information to officers that would support an inference that MV-1's phone belonged to him.

Based on the facts presented, the Government has shown that MV-1 had mutual use of and joint access to the cell phone. MV-1 was in control of the phone and was its sole, unsupervised possessor at the time she was detained. Defendant clearly gave her permission to use the cell phone by providing her with the passcode and allowing her use of the phone to coordinate her commercial sex dates. Therefore, the Court finds that MV-1 had actual authority to provide consent to search the cell phone.

### iii.    Apparent Authority

The Sixth Circuit has held that even where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's apparent authority to authorize the search through her consent. *United States v. Hunyady,* 409 F.3d 297, 303 (6th Cir. 2005) (citing *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004); *Rodriguez*, 497 U.S. at 188–89). "Apparent authority is judged by an objective standard. A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search." *Gillis*, 358 F.3d at 390–91 (citations omitted).

In this case, the cell phone was in MV-1's possession and she had complete access to it, including the passcode to open it. *See United States v. Aaron,* 33 Fed. App'x. 180, 184 (6th Cir. 2002) (concluding that defendant's live-in girlfriend had authority to consent to a search of computer owned by defendant because he never forbade her from accessing it, and did not restrict her with password protections).

Based on these facts, the officers reasonably could conclude from the facts available that MV-1 had authority to consent to the search, and this apparent

authority remedies any constitutional error that would otherwise result from a warrantless search. *See Morgan*, 435 F.3d at 663–64.

## V. CONCLUSION

Accordingly, for the reasons stated above, Defendant's motion to suppress evidence seized from the phone is **DENIED**.

IT IS SO ORDERED.

Dated:      September 21, 2016

/s/Gershwin A Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge